Gentlemen, the next case is Mary Evelyn Frye v. Best Shell. Mr. Carr here for the appellant and Mr. Unrecht, here for the appellee. You fellows ready to go? Mr. Carr. For the record, as the court knows, my name is Rex Carr. I represent the plaintiffs appellate in this matter, Mary Frye v. Mr. Cook. Jerry Best and Jersh owned a filling station in Fairfield, which was equipped with detecting nozzles that would not operate the way they're supposed to operate, and they knew it. At least Jerry Best knew it. For all the time that Mr. Best owned this station, this Shell station in Fairfield, he had two or three overflows by his own testimony, judicial admission, per month. He said it happened to him all the time. People would come in and apologize to him for having overflowed their gas tanks at these pumps. He did some investigation, and he discovered that they were more likely to overflow if the trigger was put in the first notch, that is, where the gasoline was going the slowest. He did nothing about it. Now, in his station, he had stop buttons. There was one at the cash register, one on the counter, and two out at the pumps. All that needed to be done to stop an overflow, if it was excessive, would be to push the button. On the day in question, Mrs. Frye put the pump on automatic, put the trigger in the notch, and watched the meter run. The filling station attendant, Julie Simpson, looking out the window, saw the gasoline was flowing under the car and toward the station. She and her mother—her mother was there also, but had just started the work—decided to go out. Instead of pushing the button, the mother went out. Now we have four different versions of what happened at that point in time. According to Mrs. Frye, she was watching the dollars add up, and Judy Simpson, the mother of the cash register operator, when she yelled at her as she came out, and when she yelled at her that the gas was overflowing, Mrs. Frye reached for the handle, had her hand on it, and Mrs. Simpson put her hand over Mrs. Frye's hand and pulled it out, causing the gasoline, which was flowing full. There's no doubt about this. Everybody agrees when this gas nozzle was pulled out of the gas tank, the gas was freely flowing and spouting gasoline. That's admission. Mrs. Frye says at that point in time, when Mrs. Simpson pulled the pump handle out of the nozzle, out of the tank, it splashed fully in her eyes and drenched her completely. And with that, she dropped the handle, and Mrs. Simpson guided her into the filling station where they called 911.  Mrs. Simpson's version is that she did not get closer than 12 to 15 feet from Mrs. Frye when she yelled at her, and as she yelled at her, that startled her, that startled Mrs. Frye. Mrs. Frye pulled the gas handle out of the tank, held it extended over her head, and as she did that, the gasoline vomited out of the gas tank, a gallon to a gallon and a half of it, vomited a foot to a foot and a half high, and it was the gasoline vomiting out of the gas tank that drenched Mrs. Frye's head, face, and eyes. And with that, according to Mrs. Simpson, she dropped the pump handle, and Mrs. Simpson went to her, took her by the shoulder, and took her into the station where they called 911. That's the second version. The third version is from Julie Simpson, the cash register operator, who was looking at it through the window. It was in January of 06, so it was a cold day. Anyway, looking out the window, she saw her mother not approach Mrs. Frye until after the gasoline had drenched Mrs. Frye, and that her mother had yelled at Mrs. Frye, had startled Mrs. Frye, again, her words, causing Mrs. Frye to pull the gas nozzle out and drenching herself. Third version. The fourth version was by Amanda Dye, now named Miller. She said that she, too, was watching the incident occur, and that Mrs. Simpson approached Mrs. Frye, grabbed her by the shoulder, and when she was grabbed by the shoulder, that startled Mrs. Frye, who pulled the pump nozzle out of the gas tank and drenched herself. She thinks some wind may have been involved. Mrs. Dye Miller came out of the station, the handle, the nozzle was still on the concrete, it was still pumping gasoline. She turned it off and put it back in the pump. Now, those are four versions of what had occurred. As far as the law is concerned, if the facts show up, evidence of negligence, the manifest weight of evidence is that the defendant was at fault, plaintiff wins. In this case, why the jury decided against the plaintiff, I don't know. She sustained serious injuries to her eyes. She was immediately taken to the hospital, and there was an $803 hospital bill, and the emergency room ran up. Let me ask you, is there any complaint about the jury instructions in the case? No, no. Now, this was submitted to the jury on comparative negligence? Yes. Now, that's one explanation why we might have a not guilty here. In the verdict form that the jury signed, was there any breakdown on percentages? No. It was a simple not guilty. So we have no way of knowing what degree of other than an explanation that it was greater than 50%. Right. Okay. Okay. It's our position that the overblown evidence is that the accident would not have happened if the filling station attendant, seeing the gasoline flow under the car, the car was in between the station and the pump, flow under the car and going toward the station, what she should have done then was to push the stop button. All witnesses agree, both defendants, Dersch and Vest, the operator of the station, both agree that the customer expects the pump to shut off when the gas tank is full, and that's a reasonable expectation. They don't expect the gasoline to spout out of the tank, and they expect that they're not going to be harmed when they put gasoline in there. Now, whether she was startled, whether she splashed it on herself when she was startled, whether this incredible thing that a gallon, a gallon and a half of gasoline spouted out of a tank that can only hold, say, 20 gallons, which some other 21 and a half gallons got in there, the tank was clearly overflowing. Nobody can test that. So this gallon, a gallon and a half of gasoline that Mr. Simpson says spouted out of the tank had to come from somewhere. Her story is absolutely incredible. According to her story, the extended gas tank nozzle flowing the gasoline in the air, none of that got on Mrs. Frye. The gasoline that got on Mrs. Frye was the gasoline that vomited out of the gas tank into her head and her face. Now, the judicial admissions, and these are judicial admissions at best, that he knew the nozzle would not shut off when the gas tanks were full. He had three or four of these overflows per month. Albeit, he says, it's only a few ounces of wet spot on the ground. Nevertheless, it overflowed two or three times a month. Had been doing that ever since he owned the station. He himself said that it happened to him so many times that he couldn't count them. It happened to him all the time when he overflowed his gas tank at these pumps. And he never took his eyes off of the gas tank when he was filling it because it happened to him so many times. Now, when he acknowledges that he knows it's going to overflow, and he doesn't instruct his employees to push the emergency button, that's open and shut negligence. They have the means to prevent injury to anybody by pushing the button. So you don't have to have somebody get startled. Getting startled and pulling a nozzle out of a tank is not unexpected. It can't be considered negligence in any form. So you take any one of the four versions. Take the version that they put in that Mrs. Fry did it to herself when she was startled. Take that version. That's not negligence on her part. People do get startled. The negligence was on the part of the owners of the filling station who knew they had a dangerous condition. That is, if you put the trigger of the handle on the first notch, there's a tendency that it's going to overflow. It's going to overflow two or three times a month. Best himself was there when a truck driver had put the nozzle in a gas tank, went in to use the john, and it overflowed at that point in time. He saw the capacity of this to do harm. And for him not to have his employee, now he says he instructed the employees to use the button, and I set this out in the reply brief and in the brief. He says he instructed them, and they didn't use the button, although he instructed them to do so. Employees said that they were instructed to use the button only in the event a customer drove away and jerked the hose off of the pump and jerked the nozzle off, though it was a constant flow of gasoline. That's what they say, and that's the reason she said she didn't use it. Well, it's all beside the point that the nozzles weren't effective by definition. They are supposed to shut off the flow of gasoline when the tank is full, period. That's the way it's supposed to work. Any nozzle that doesn't work that way is by definition defective. He knew he had these defective pumps. He knew that two or three times a month they had overflow, and he did not tell his people to turn it off, at least they say. He says he did. They say that they were instructed not to use it except in a dire emergency. So this accident would not have happened had the defendant not had, and everybody agrees with this. Dersh and everybody agrees that it wouldn't have happened if they had used the stop button. It wouldn't have happened if the nozzles had not been so conditioned that they would overflow two or three times a month. So the plaintiff's negligence or comparative negligence really has nothing to do with it. Certainly the jury has the right to determine that she was negligent and that it was her negligence that overcame, but this court has the right to turn that verdict over if it's not reasonable under the facts. If it's against the matter of fact, if any reasonable interpretation of facts adds up to defendant's negligence, a jury can't put the fault on the plaintiff. That's what this court is for, to stop that kind of thing. Now, you ask why did the jury do this? All I can tell you is that the defendant's major defense in the case was that Mrs. Frye was exaggerating her injuries, that she had eye problems before this. Let me stop you before you get to the injuries, and I understand your theory that all they had to do was hit the stop button. Yes. But is it your position that if you pull out the handle and you keep your hand on it, that it's supposed to shut off when your gas tank's full? Because you could be splashing gas everywhere, couldn't you? No, it's supposed to shut off when it's in the tank and the tank is full. Right, but if you pull it out and you keep your hand around it, it can still spew gas. Yes, it can't spew gas. If you recall, if you put it in with your hand on it, the trigger will collapse when the tank gets full, and when you pull it out, it won't run. But if you squeeze it, it'll run. No, it won't run. You're squeezing it when you pull it out. If you re-squeeze it, it will run. When it collapses to start with, it stays collapsed until you release it and then squeeze it again. So was your client spewed with gasoline while the handle was in her fuel tank or after? No, after. After. Everybody agrees that the tank was overflowing. The nozzle was in the tank when it was overflowing. It obviously had to be full. She didn't have her hand on the trigger. The trigger was in the notches. Her hand, she was turning. She didn't have her hand. She put her hand on it by everybody's agreement. She put her hand on it after she was yelled at, and she then put her hand on it. She didn't have her hand on it. She wasn't pulling the trigger when she was filling the gas tank. Now, all that was in front of the jury. It was argued by the lawyers, and then both of you decided to send that to the jury as an all or nothing. We had an option. We had an option. You could have had them assign percentages on comparative. But this way it was either going to be a verdict of not guilty or a verdict. They were instructed on comparative. They were, but how were they allowed to assign percentages? They were. They wanted to, but they had to form. You had three forms. Right. They signed C. One for the plaintiff finding the damages, one finding comparative fault, and another absolute not guilty. So you're pretending then that they found your client 100% at fault. They just did a not guilty, or they said she wasn't in. No, even if they found my client 51%, they could still assign the not guilty verdict. That's not the issue. My position is that my client wasn't at fault 51%. Did they have an option to assign 10% to your client? Absolutely. But it would have been a not guilty if they had, because it has to be 51%. I understand. Sure, they had that option, but they didn't do it. They had the option to find 10% if they wanted to, but they didn't. And that is the point, Your Honor. In this case, the overwhelming manifest way of the evidence is against the jury verdict. Given the circumstances that the defendants have judicially admitted that they have defective nozzles, have judicially admitted that they have the ability to stop the injury, they both said clearly, yes, if the button had been pushed, whatever Mrs. Fry had done would have been a no consequence, except Dersch did say that some gasoline will follow the nozzle, even if it's turned off by the button, and you pull your nozzle out, some gasoline is going to follow. Well, that happens all the time. Every time you pull, every time you fill your tank, and the gas shuts off automatically by a push of a button, some gasoline is going to come out, but not a gallon, a gallon and a half, enough to go up into your face and drench your eyes, and everybody agreed it was a significant amount of gasoline. So the point I'm making here is I believe what happened is the jury became, they either didn't like me, or they didn't like Mrs. Fry, or they believed that Mrs. Fry was exaggerating her injuries, they made a great to-do of that, and that therefore she should get nothing because she was exaggerating her injuries. They had the right to believe that under the evidence. That was the major defense the defendant put forward. But they didn't have the right to dislike me or dislike her so much that they would award her nothing when they admitted damages, going to the hospital was at least $803. They had no right to ignore the manifest way of the evidence, and it's the burden of this court to examine the evidence. And if what I say here is true, that the defendants judicially admitted that they had defective gas tanks, judicially admitted that the injury would have been completely avoided if they had simply pushed the button, but what the actual circumstance about it happened, you can't believe Judy Simpson's story, that a gallon and a half of gasoline vomited out of the tank, that the woman was holding the gas thing above her head and was spouting gasoline, none of that got on her, but what drenched her was the gasoline spouting a foot, foot and a half out of the tank. That's incredible. You can't believe that story. But even if you do, it would not have occurred when they saw the gasoline flowing under the tank, under the car and toward the station. At that point in time, it had not vomited out. She had not pulled it out and held it over her head. She had done nothing. She was watching the meter. At that point in time, they pushed the button, period. No damages, no injury. So the jury had no right to ignore the manifest way to the evidence, and we believe we're entitled to a new trial because of the jury's apparent disregard, clear disregard, if you will, of the weight of the evidence. People that go into filling stations have the right not to be injured by defective nozzles, which won't shut off. We all have that right. We have the right to know that if somebody sees a possible danger, the gasoline flowing into that car toward the station could have been ignited, a spark could have occurred, a major disaster could have occurred. When they saw, and this was minutes before she actually went out to stop, she had to go from the station to the gas tank all the while this gasoline was flowing under this car, unabated, unstopped. At that point in time, we all have the right to expect that the filling station will push the button. When they didn't push the button, knowing they had defective valves, nozzles, that's sure weight of evidence that can't be overcome by anything Mrs. Fry did or any other customer did or did not do under those emergent  Thank you, Your Honor. Good morning. My name is Craig Unrath for the FLEs. I'd like to start with the basic rule of law here. What is the function of the jury? The jury's function is to weigh contradictory evidence. It's to judge the credibility of witnesses and to arrive at ultimate conclusions of fact. Now, in this case, the jury really had their work cut out for them. They had four different versions of an accident. How do you deal with that? Where do you start? In this case, they had one thing going for them, one thing that simplified their task a little bit. Plaintiff's version of the accident was simply and completely unbelievable. It could not have happened the way she said it did. Now, there are three allegations of negligence in this case. The first one is that an employee of the gas station put her hand on top of Mary Fry's hand and, while holding the trigger, pulled that nozzle out of the gas tank, spraying gas everywhere. Now, they brought in a gas handle right into the courtroom, showed the jury, put somebody's hand on it, and then they had Judy Simpson say, put your hand on top of their hand and try to pull the trigger. She couldn't do it. They tried different people's hands. Couldn't do it. Her hand simply is not big enough to fit on top of someone else's hand and still pull that trigger. So right off the bat, we know we've got a problem with that Mary Fry's version of the case. Now, do we throw out the whole story then? Of course not. Of course not. Maybe that's just part of the problem. Okay, let's say that Mary Fry was the one holding the trigger. The fact is that she's alleging that it was our employee that pulled that nozzle out of the tank. Well, there's another problem there. They tested that. With Mary Fry on the stand, they said, how did this occur? Where were you standing? Where's the car? Where's the pump? Let's reenact that entire scenario. And they tried it in every conceivable way they could, and the result was the same each time. If an employee had pulled that nozzle out of the tank, that employee would have been drenched with gas. It seems as if the plaintiff's counsel has focused on his argument there, that the negligence was primarily not pushing the button, regardless of which of the four scenarios you want to believe. That's where the negligence occurred. Actually, I heard a number of different theories. He also claims that we have defective equipment as well. But in terms of the emergency shutoff, in our brief, we have quoted testimony from DERSH. They said, point blank, if somebody had hit the emergency shutoff button, would it have prevented this accident? He said, maybe yes, maybe no. The testimony is split on that. Now, you can find testimony in there where the testimony is, it would have prevented the accident. And he's got that in his reply brief. It's right there. Would this have prevented the accident? Isn't that true? The answer, correct. That's fine. I'll get you some testimony where they say it depends. What would it depend upon? Well, for one thing, Judy Simpson, I get them mixed up, Judy said that the gasoline vomited from the tank. That could have still happened without the emergency shutoff being hit. The other possibility is that there's enough pressure in the hose. You pull that hose out and hold it over your head, which is the testimony of three different witnesses, there might be enough pressure in that hose to drain gasoline on you. And keep in mind, we have a 40-mile-an-hour wind. Even with the pump shut off. Even with the pump shut off. And keep in mind that we have a January day with 40-mile-an-hour winds. Now, any amount of gas coming out of there, hitting into that wind has the potential to get in your face. This is contradictory evidence, and it is the jury's role. It's their duty. This is their job, is to resolve and weigh those contradictions. They resolve this in favor of the defendants. And respectfully, it is not this court's place to re-weigh that evidence. Now, as I pointed out, getting back to Mary Fry's testimony, she said that it was our employee that pulled the nozzle out of the tank. If that's true, the employee would have been drenched with gas. But guess what? It is absolutely 100% undisputed that the employee, Judy Simpson, didn't get a drop of gas on her. Accordingly, at a very early stage in this trial, to the jury, they know Mary Fry's version of events can be rejected out of hand. It is impossible. Couldn't have happened the way she said it did. So where do they go from here? Now, we still have three other versions of the accident. How does the jury choose among those? Well, you start by looking for anything that might be consistent in those three other versions. And there are three things that are consistent. One, that Mary Fry was the one who pulled the nozzle out of the tank, not an employee. Two, that it was Mary Fry holding the trigger down when she pulled the nozzle out of the tank. And three, no employee did anything that would have caused gas to splash in her eyes. Now, that is those three elements are consistent throughout every version of the accident, except Mary Fry's, and Mary Fry's version is physically impossible to reproduce. Now, Julie Simpson, she said that the gas splashed in her eyes as a result of the car vomiting gas. Now, I've never seen that happen. I've had many times where I've had gas overflow on my tank. I've never seen it vomit. Personally, I looked at that story and I thought, it's so nutty. She wouldn't have said it unless it was true. But here's the deal. We went to trial on this, and her version of the events was no secret. This was no surprise. This was her version, and we had testimony where one of the witnesses, Dersch, I believe, said he spoke to the mechanic. And the mechanic said, yeah, this can happen. It really does happen. Certain models, it happens more than any other. And guess what? Mercedes-Benz is one of those models. Now, counsel, in his brief and here in oral argument, has said that that is completely unbelievable, defies the laws of physics. Well, if that's the case, then how about an objection to trial? How about bringing a witness, an auto mechanic of his own, to put on the stand and say that can't happen? Well, he didn't. What we have is unrefuted testimony that this is possible. It could have happened. Then we have the other version, her daughter. I always get them mixed up, Julie. She said, and my friend, this is probably the most believable, she said that when Mary Frye went down, startled to see that her gas tank was overflowing, she pulled that hose up in the air, and in a 40-mile-an-hour wind, it blew on her face because she was still holding the trigger down. Sounds pretty believable to me. Now, that happened after the first Simpson employee went out and yelled at her that the gas is flowing underneath your car. And nobody pushed the button at that point. The first employee, Judy Simpson, stepped out the door and said, hey, lady, what are you doing? And Mary Frye didn't hear her. So she walked closer. And she didn't push the button because her employer said the only time you do it is if somebody runs into the tank or somebody's stealing gas. There's conflicting testimony on that as well. That would certainly be the most common usage for the button. When somebody drives away with the hose still in their tank and rips the hose out, you have an uncontrollable spill. The only way, you can't stop it any other way. The handle is driving down Main Street. Yeah, that's one thing. Didn't he say that's the only two circumstances he told him to hit the button? No. No, he did not. And this was always within that they had that choice. He never said don't use it. Again, we have more conflicting evidence on this as well. It was the jury's duty and position to weigh that conflicting evidence and make a judgment call. Now, when you start adding up all three versions, I skipped over Amanda Miller. Quite frankly, Amanda Miller is a very confused individual in my opinion. I think that if you had kept her on the stand long enough, she would have said anything. She seemed to think that it was either gas vomiting out or the wind. She wasn't sure. When you add it all up, there is significant amount of evidence suggesting that this accident was predominantly the fault of Mary Fry. And the jury had every right to believe that. The jury, that conclusion is supported not only by testimony in the record, but it's supported by common sense. And I think it's important to keep in mind that juries, as we all know, are not required to leave their common sense at the door. They bring that common sense with them right into the courtroom. Everyone, and I guess I'm stepping out on a limb here, but everyone at some point in their life has had an experience with an overflow situation. It's happened to me many times. And if you haven't had it done personally, what was the last time that you filled up your tank and looked down and saw what appears to be kitty litter on the ground? Well, that was the last guy. He had overflow, not you. We have three allegations of negligence here. One is that our employee yanked that nozzle out of the tank. That's impossible. It's impossible because Judy Simpson didn't have a drop of gasoline on her. The second, and plaintiff's counsel raised this just moments ago, he says that everybody agrees that we had defective equipment. I disagree with that entirely. It's one of the main arguments in my brief, and it's supported by the testimony, that the mere fact that a gas tank overflows does not mean that the handle is defective. There are many ways that you can defeat the overflow mechanism. One, and actually I learned something. It's a little hole on the nozzle, and I've been looking at those things ever since I read the transcript of this trial. There's a little hole at the bottom of the nozzle there. A little bit of dirt, snow, or ice on a January day gets into that little hole. If the user doesn't put the hose all the way into the tank, if they just kind of rest it on the outside, it won't work. If you try to top off your tank, it won't work. Now, they tested this nozzle that Mary Fry used, and it worked just fine. They tested it repeatedly. They never had a problem with it again. They never replaced it. It was inspected, and it was fine. So to suggest that we had defective equipment is, to my mind, completely unreasonable. As a matter of fact, that conclusion would have been against the manifest way to the evidence. Now, I've already addressed the third allegation. That's the shutoff switch. We have conflicting evidence on that. Yes, it could have happened. Somebody could have hit that switch the moment they saw gas, and that might have prevented this accident from happening. But it might not have. And we have evidence in the record, cited in my brief, that states that it might not have prevented the accident. And the jury has a right to make that determination. Where did that testimony come from, that even if they hit the button, it still may have flowed? That would be, I believe it was, Dersh. And I have it in my statement of facts and in my argument. One thing that came out of Dersh's testimony when he was talking about this, he said, No, it may have decreased the likelihood, but there's no way to say that it would have prevented it. Absolutely. He said, but the one thing about this is that the quickest, simplest, easiest way to prevent this accident is just to release the mechanism. Squeeze the handle and let it go. Gas stops flowing. Now, they mentioned this to plaintiffs. At one point, she said, Well, when I first saw it overflowing, I tried to decrease the notches. Later on, she said, Well, I don't know how those notches work. That's completely out of my experience. So now we're dealing with some serious issues of credibility. We have an individual who at one point says that they know about the notches on a gas handle. Now they're saying that they apparently don't know how to operate one. You add this into the other problems with her testimony. The fact that she said her eyesight had gone massively worse, but her eye doctors never bothered to change her prescription. The fact that she said she was, that she made this call to the emergency room six months after the accident. Then there's a suggestion there that she wanted the hospital to change her records. You start adding all this up and then throw in the fact that her version of the events is completely unbelievable. Well, at that point, the jury has no choice but to start looking at this and wonder, maybe this really is the fault of Mary Fry. There is evidence to support that. Now, one last thing I'd like to point out is that this was a remarkably clean trial. Did you see the post-trial motion in this? I believe it's only one sentence long. The jury's verdict goes against the manifest way of the evidence. That's it. No problems with evidentiary rulings. No motions in limiting jury instructions. No problem there. No juror misconduct. No problems at opening statement or closing argument. This trial is remarkable in that it has so few errors. This was a clean trial. We want to do it again? Well, Mary Fry is locked into her testimony. It's not going to change. Her testimony, in many respects, is simply unbelievable. It's going to be unbelievable the second time around, too. The second time around, we are still going to have conflicting evidence here. Maybe the coin will flip to the other side. Maybe not. But the fact is that it's not this court's position, respectfully, to make that call. It's not this court's position to re-weigh the evidence. One thing in particular about the plaintiff's counsel's argument was he said, well, this verdict is unreasonable, and it's this court's position to fix that. And that's not true. I'll just say that flat out. It's not true. This is the rule, is that the fact that other conclusions might be reasonable is of no consequence. That's the standard we're dealing with. If there is evidence to support the jury's decision, and there is, it should not be disturbed. That's what we're dealing with here. That's the position of a jury. And I believe for the sanctity of our system of jury trials, this jury's verdict must be affirmed. Is there no further questions from the court? Thank you, counsel. Scott. Counsel doesn't understand the law, I suppose, about the function of this court. If the jury verdict is against the manifest weight of the evidence, this court must reverse. If you conclude that this verdict was against the manifest, even though there may have been evidence to support it, that goes to the directed verdict business. Evidence to support it doesn't mean that it's not against the manifest weight of the evidence. And counsel just stated when he said, we've alleged that she had her hand on the trigger. What we allege is that they maintained and operated a gas pump that was defective and that it would not shut off automatically when the gas tank was full. That's A. They carelessly removed the nozzle from the gas tank of the plaintiff's car while gasoline was still coming out of the nozzle and caused the gasoline coming out of said nozzle to spray in the plaintiff's face and eyes. And C. Failed to turn off the gas pump and stopped the flow of the gasoline prior to taking the nozzle out of the gas tank of the plaintiff's car. Now, the manifest weight of the evidence that this jury verdict is against are judicial admissions of the defendants. Now, judicial admissions, as this court knows, they cannot be contradicted. The counsel cannot, defendant cannot put in evidence to counter or contradict that which he has judicially admitted as a concrete fact. Now, as far as the issue of the button is concerned, what was he told? This is best testimony. I put it in our brief and in our reply brief as well. Well, you have taught your employees not to push the button, haven't you, sir? Answer, no, sir, I did not. Question. Didn't you tell them they were not to use buttons except in the case of an emergency? And your definition of an emergency is when somebody ran into the pump or somebody drove off in a car with a nozzle in the car. Isn't that what you taught your employees? Yes. Is that a yes or no? That's a yes. That's what he taught his employees. But I didn't tell them not to use the button. Mr. Best, don't you believe if you told them only to use the button under these two circumstances that you related to them, that an employee would believe that they were not to use the button under any other circumstances? They might do that, yeah. That's his admission as far as the buttons are concerned. Did you have evidence to refute Dersh, I think is what Mr. Enrath said, that even if the button had been pushed, the accident still could have happened because it wasn't an immediate turnoff or whatever? Did you have something to counter that? No. Mr. Bersh didn't testify that way, Your Honor. What Mr. Dersh testified is that the accident would not have happened if it had not, if it had been turned off. Mr. Bersh. Let me find it. We'll find it. That's all right. Mr. Carter. Oh, go ahead. I apologize. That's all right, Your Honor. I'm asking the question, when you, what she saw was after she got out of the station, her version, she didn't get even 15 feet from it. Amanda Dyer's version, she grabbed her by the shoulders, so we have two different, but that's beside the point. The point I'm trying to make is that however it happened, it happened after they knew the gasoline was overflowing, it happened after they knew that they had a problem with the circumstance, it happened after they knew all they had to do was to push a button, if they had been authorized by Jerry Vest to do so, and it might cost them 5, 10, 20 minutes of downtime. They could have done that, and that would have prevented this entire episode, regardless of what, of whose version you believe. Isn't that right, Mr. Dersh? His answer was, knowing what we know now, I don't think anybody would dispute that. They wished that the button had been pushed, and that had been pushed. And my question was, that's not what I'm asking you. He said, yes, sir. Of course, nobody wants the injury to take place, but I'm not suggesting anybody here would want that to be visible on Mrs. Fryer. What I'm saying is it could have been prevented. Could it not, sir? Answer, sure. That's Mr. Dersh's testimony. That's a judicial admission, Hunter. Let me ask you about your client's testimony. Does she know she released the trigger? Yes, she testified that she put the trigger on the notch. She didn't have a hold of it. Nobody argued that she did have a hold of the trigger. Okay, so if she had put her hand on there and released the trigger, it would have shut off. No, it's supposed to do it automatically. I understand that. But if the jury believed she could have put her hand on there and released that trigger, it would have shut off. They could have inferred that was negligence on her part. Well, under the circumstances of being startled by the yelling, I think it would be completely against the manifest with the evidence for her to be so cool-headed as to reach in there and turn. Nobody says that she had her hands on the trigger. She was reaching for the trigger in order to turn it off according to her version. She was reaching for it at that point in time, but it was pulled out by Mrs. Simpson before she could get her hand on the trigger, pulled out with the gasoline still flowing. Her hand wasn't on the trigger. If the jury determined that a reasonable person, even though startled, could have put their hand on there and pulled that trigger, their verdict would have some support. No, they had no evidence at all of that. That would be pure speculation because nobody said that she had the opportunity to put her hand on the trigger. Everybody agreed that the moment she was either yelled at or grabbed, she was startled. Startled means you're not thinking. So there was no evidence to suggest. Let me ask you this. There are three or four different versions of this. Four, yes. Four. If the jury can't figure out which version's true, you have the burden of proof. No, what I'm saying, Your Honor, take any version you want. Take the worst version against Mary Frye. Take the worst version. Take the version of the closest witness to her that it vomited out of the gas tank. Take any version you want. Take the version of Julie Simpson that she was startled when her mother grabbed her on the shoulder and she pulled it out. Take any version. Defendants have judicially admitted that they were at fault. Also, when they don't push the button, the case is over. Right. Exactly correct. Thank you, Your Honor.